# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

PAMELA MILLWOOD-JONES,     *
                       *
      Plaintiff,          *
                       *
      v.                    *         CV 214-035
                       *
ERIC H. HOLDER, JR., Attorney   *
General,                  *
                       *
      Defendant.          *

## ORDER

Presently before the Court is Defendant's Motion for Summary Judgment (dkt. no. 43), which the parties have fully briefed, <u>see</u> dkt. nos. 51, 54-55.[1] For the following reasons, Defendant's Motion (dkt. no. 43) is **DENIED** in its entirety.

## BACKGROUND[2]

At all relevant times, Plaintiff and her husband, Jason Jones, have worked for the Federal Bureau of Prisons (the "BOP")

---

[1] Defendant notes that since Plaintiff's filing of this action, Eric H. Holder, Jr., has resigned as Attorney General, and Loretta E. Lynch has assumed this position. Dkt. No. 43, p. 1 n.1. Pursuant to Federal Rule of Civil Procedure 25(d), the Clerk of Court is hereby **DIRECTED** to substitute Loretta E. Lynch for Eric H. Holder, Jr., as the named Defendant in this case.

[2] Defendant has filed a Statement of Material Facts (dkt. no. 43-1), and Plaintiff has filed a Response (dkt. no. 51-1) largely agreeing with Defendant's recitation of the facts of this case. Accordingly, the Court, for ease of exposition, cites only to Defendant's version of the facts (dkt. no. 43-1) as the Statement of Undisputed Facts ("SUF") and specifically notes herein any facts with which Plaintiff disagrees.

at the Federal Correctional Institute in Jesup, Georgia ("FCI Jesup"). SUF, ¶¶ 1, 3, 11. Loretta E. Lynch is the Attorney General of the United States and the head of the United States Department of Justice. Dkt. No. 1, ¶ 5; Dkt. No. 43, p. 1 n.1. As the BOP is an agency of the Department of Justice, she has ultimate authority over BOP decisions. Dkt. No. 1, ¶ 5.

While Plaintiff's initial position at FCI Jesup was that of a correctional officer, Plaintiff subsequently applied and was selected for a unit secretary position—a position that she assumed on August 15, 2010. SUF, ¶¶ 4-5. Plaintiff has testified that while a unit secretary receives less pay than a correctional officer, she applied for the position "to broaden [her] experience." Id. at ¶ 6. However, after eight months in this position, Plaintiff requested to return to her previous position as a correctional officer. Id. at ¶ 5. Plaintiff's transfer from Unit Secretary back to Correctional Officer is reflected in a Notification of Personnel Action bearing the effective date May 8, 2011. Id. at ¶ 7.

## I. Plaintiff's Relationship with David Pritchard ("Pritchard")

In May 2011, Plaintiff and Jason Jones separated. Id. at ¶ 12. Within days, Plaintiff began speaking to Pritchard—an FCI Jesup Lieutenant at that time—"on a personal level." Id. at ¶¶ 13-14. Plaintiff and Pritchard communicated daily, exchanged romantic feelings for one another, and had their first sexual

2

encounter on July 2, 2011. Id. at ¶¶ 16-17. Plaintiff has admitted that over the course of the months-long relationship that ensued, she had intercourse with Pritchard and performed oral sex on him. Id. at ¶ 14.

On one occasion, Plaintiff took her son on a fishing trip with Pritchard and his son. Dkt. No. 43, Ex. A ("Pl.'s Dep."), 71:22-72:1. According to Pritchard, he was drinking whiskey during the fishing trip, and Plaintiff performed oral sex on him while their sons were at the opposite end of the fishing pier. Dkt. No. 51, Ex. 11 ("Pritchard Dep."), 65:13-17, 91:2-6. Plaintiff, however, maintains that the two did not engage in sexual activity on the fishing trip because the two children were present. Pl.'s Dep., 72:2-7.

In October 2011, Plaintiff began to suspect that Pritchard was having sexual relations with two other women, including FCI Jesup Nurse Tracy Townsend ("Nurse Townsend"). SUF, ¶¶ 18, 23. When Plaintiff confronted Pritchard about her suspicions, he denied having any relationship with Nurse Townsend; however, when Plaintiff asked Nurse Townsend, Nurse Townsend confirmed that the two were seeing each other. Pl.'s Dep., 76:1-7, 90:11-14. The relationship between Plaintiff and Pritchard came to an end in late October 2011. SUF, ¶ 19.

Pritchard has testified that BOP policy prohibited him, as a superior officer, from engaging in a sexual relationship with

3

Plaintiff—and that he knew that he was violating this policy during their relationship. See Pritchard Dep., 20:9-13. As Pritchard has acknowledged, however, there was no BOP policy that forbid Plaintiff's carrying on of such relationship. Id. at 20:14-18.

## II. Plaintiff's Reporting of the Relationship and Pritchard's Demotion

Plaintiff reported her affair with Pritchard to Warden Anthony Haynes ("Warden Haynes") in a memorandum dated November 16, 2011. Id. at ¶¶ 20, 28. Specifically, the memorandum stated as follows:

> I . . . have been having an affair with . . . Pritchard since July 1, 2011. I have an emotional attachment to [Pritchard,] and he is aware of this. He has also stated that he was attached but he was going to work thing[s] . . . out with his wife. We ended our affair around October 27, 2011[,] because of this reason. Recently[,] I found out he is seeing [Nurse] Townsend . . . . I asked him not to let her come and sit in his office . . . . Today[,] she baked him cookies and brought them to his office. . . . . I think that he intentionally flaunted her and allowed her to visit with him in his office knowing that I would be upset.

Id. at ¶ 20. Upon receiving Plaintiff's memorandum, Warden Haynes instructed her to complete a second memorandum giving a more direct and clear account of what happened. Id. at ¶¶ 28-29. Accordingly, Plaintiff submitted a second memorandum, in which she added that, "[d]ue to [their] relationship and [Pritchard] subjecting [her] to the emotional trauma of watching

4

his behavior with another female staff member, [she] [could] not

. . . perform [her] job duties in a safe and effective manner

with him as [her] supervisor." Id. at ¶ 31 (first alteration in

original). Plaintiff also confronted Pritchard, in front of

Nurse Townsend, about their affair and informed Pritchard's wife

of her husband's affairs with Plaintiff and the two other female

staff members. Id. at ¶ 68.

Warden Haynes referred Plaintiff's memoranda to the BOP's

Office of Internal Affairs (the "OIA") for investigation. Id.

at ¶ 30. Additionally, Captain Glenn Carrino ("Captain

Carrino") notified Pritchard that Plaintiff had accused him of

violating BOP policy. Pritchard Dep., 31:16-22. Captain

Carrino ordered Pritchard to "refrain from any disruptive

behavior or the appearance of inappropriate behavior." SUF, ¶

32. He further advised Pritchard "to avoid interaction and

contact with [Plaintiff] and . . . Jason Jones, her husband, at

all times." Id.

Ultimately, the OIA investigation resulted in a charge

against Pritchard for the offense of "Inappropriate

Supervisor/Subordinate Relationship." Id. at ¶ 33. Based on

this charge, Pritchard received a demotion, effective July 1,

2012, from Lieutenant to Sport Specialist. Id. at ¶¶ 34-35.

**III. Pritchard's and Other Employees' Conduct Toward Plaintiff**

AO 72A
(Rev. 8/82)

On November 17, 2011, just after Plaintiff reported their relationship, Pritchard attended a meeting with several other lieutenants and officers—including Lieutenant Joseph Arnett ("Lieutenant Arnett")—as well as Captain Carrino's Secretary at the time, Jodi Thomason ("Thomason"). Dkt. No. 51, Ex. M ("Thomason Dep."), 114:22-115:13, 115:20-116:11. Thomason has testified that during this meeting, Pritchard discussed his fishing trip to the pier with Plaintiff and related that he had been drinking heavily, "his dick had fell [sic] in her mouth," and "he didn't know how it [had] happened." Id. at 116:3-6. According to Plaintiff, Pritchard made this statement because he was angry that she had informed his wife of his affairs and had a "personal vendetta to humiliate her through deceitful lies." SUF, ¶ 68.

Soon after the November 17, 2011, meeting, another officer informed Plaintiff that Officer Jeremy Bowen ("Officer Bowen") had made a comment on December 3, 2011, referring to Plaintiff as having "road rash" on her mouth from performing oral sex. Pl.'s Dep., 100:21-101:6. Officer Michael Brown also notified Plaintiff that another FCI Jesup employee had warned him "not to get caught on the pier" with Plaintiff. Id. at 154:12-18. Additionally, Thomason heard Lieutenant Arnett joke about Plaintiff's sexual activity by stating, "Don't go fishing with [Plaintiff]." Thomason Dep., 118:22-25.

AO 72A
(Rev. 8/82)

As Thomason was the President of the prison employees'
union, multiple prison officials reported to her that they had
heard others—including Lieutenant Arnett, Officer Bowen, and
Officer Franklin Linder ("Officer Linder")—making derogatory
comments and jokes about Plaintiff. Id. at 7:7-10, 120:23-
130:21. In one instance in particular, an employee went to
Thomason's office after a "lieutenants meeting" at which
Thomason had not been present. Id. at 123:12-21. The employee
told Thomason that at the meeting, Lieutenant Arnett had asked
Pritchard—with regard to Plaintiff performing oral sex—"[D]id
she swallow?" Id. at 123:23-25. However, Lieutenant Arnett has
since denied making this comment in reference to Plaintiff,
instead insisting that he asked this question while on the phone
with his wife discussing their daughter's swollen tonsils. SUF,
¶ 66.

Plaintiff also has testified that some of her coworkers
made hand motions mimicking the act of performing oral sex when
they passed by her in the hallway. Pl.'s Dep., 158:24.
Plaintiff has indicated that she cannot identify every single
instance of this or any other act, because the FCI Jesup
employees made comments or gestures about her sexual activity
"every single day." Id. at 158:10-159:10. Even the prison
inmates eventually caught on and joined in on the gossip. See
id. at 147:19-23.

AO 72A
(Rev. 8/82)

Distraught over her coworkers' actions, Plaintiff began feeling sick and went to get checked by the medical department at FCI Jesup. Id. at 101:6-9. Plaintiff learned that her blood pressure was high and thus decided to leave work and seek care at Wayne Memorial Hospital. Id. at 101:7-11. Plaintiff avoided returning to FCI Jesup and worked only periodically for the rest of December 2011. Id. at 101:14-17.

## IV. Reporting of the Conduct Toward Plaintiff

On January 31, 2012, Plaintiff contacted an Equal Employment Opportunity ("EEO") Counselor with the BOP to initiate the process of filing a sexual harassment complaint based on the "inappropriate conversations between [her] supervisors." Dkt. No. 11, Ex. C. Plaintiff finalized the EEO complaint on March 14, 2012. Id.

Additionally, on February 15, 2012, Thomason sent an e-mail to Warden Haynes informing him, in part, that Pritchard had made comments to fellow staff members concerning his sexual relations with Plaintiff. SUF, ¶ 36. Thomason stated in the e-mail that she "should most likely have reported these things . . . a few weeks [before] however [she] had hoped for a better solution for all staff involved." Id. at ¶ 39. Following an OIA investigation into Pritchard's conversations, it was determined that Pritchard—in stating that "his dick fell in Plaintiff's mouth"—had engaged in "Unprofessional Conduct of a Sexual

AO 72A
(Rev. 8/82)

Nature," but that Lieutenant Arnett and Officer Bowen had not made any comments warranting a similar charge. Id. at ¶¶ 37, 43.[3] Pritchard was disciplined for this offense in the form of a three-day suspension and a written reprimand by Warden Suzanne Hastings ("Hastings"). Id. at ¶¶ 41-42.

## V. Scrutiny of Plaintiff's Leave Request

After initiating the process of filing an EEO complaint on January 31, 2012, Plaintiff spent several days out of the following month at an inpatient psychiatric facility. Dkt. No. 51, p. 14. When Plaintiff submitted a request for approval of her medical leave along with a doctor's note, Captain Carrino placed the note in a safe in his office and did not immediately process the request. SUF, ¶ 79. It was not until two weeks later, when Thomason inquired about the leave request, that Captain Carrino removed the doctor's note from his safe and explained that the note needed to be verified because it appeared that the date on it had been altered. Thomason Dep., 58:9-59:19.

As any further delay in the approval of Plaintiff's leave request would have threatened her receipt of a paycheck for that pay period, Thomason suggested that Captain Carrino call the doctor's office at the number listed on the letterhead so as to

---

[3] Plaintiff admits that the OIA investigation reached this conclusion but nevertheless contends that Lieutenant Arnett and Officer Bowen were cleared of any charges "only because the investigation was deeply flawed." Dkt. No. 51-1, ¶ 37.

9

receive verification in an expeditious manner. Id. at 58:16-17, 60:22-25. Nevertheless, Thomason has testified that she did not believe that the doctor's note was forged and would not have questioned its authenticity. Id. at 59:2-8. Thomason has also indicated that in her time as union President, she had dealt with a similar matter involving an allegedly altered medical document only one time, several years prior to this incident. Id. at 59:20-25.

Upon calling Plaintiff's doctor's office, Captain Carrino discovered that the doctor had made a mistake and changed the date on the note. SUF, ¶ 79. Soon thereafter, Captain Carrino processed and approved Plaintiff's leave request. Id.

## VI. Overtime Shifts and Medical Trips

On March 14, 2012, Plaintiff began to notice that she was being passed over for opportunities to work overtime shifts and medical trips. Id. at ¶ 59. FCI Jesup has an electronic system for assigning overtime shifts and medical trips: any staff member interested in these opportunities may sign up on a list; the list is sorted so as to give priority to correctional officers over other staff members; and a lieutenant responsible for filling overtime positions for the given day works down the priority list from top to bottom until all available positions are filled. Thomason Dep., 88:18-89:4, 93:14-15.

AO 72A
(Rev. 8/82)

Plaintiff has submitted an affidavit specifically discussing the overtime shifts on June 1 and 7, 2013—days on which she happened to print the screen for the overtime sign-up system—along with copies of those screenshots and of the overtime sign-up sheets and daily rosters disclosed by Defendant for the purposes of this lawsuit. See Dkt. No. 51-2 ("Pl.'s Aff."), ¶¶ 3-8 & Exs. A-B. Plaintiff's screenshot of the overtime sign up on June 1, 2013, shows that she was third on the list for the evening-watch overtime shift; however, Defendant's overtime sign-up sheet for this date lists Plaintiff as number twenty-three on the list, and the daily roster reflects that four other officers were selected to work overtime during this shift. Id. at Ex. A. Plaintiff's screenshot for June 7, 2013, indicates that she was fourth on the evening-watch overtime sign up, but Defendant has produced for this date a sign-up sheet showing Plaintiff in the twenty-fourth spot and a roster assigning four other officers to this shift. Id. at Ex. B. Plaintiff affies that she was never contacted about or offered the opportunity to work these overtime shifts. Id. at ¶¶ 5, 8.

Additionally, it is undisputed that Plaintiff worked as a correctional officer on both June 1 and 7, 2013, SUF, ¶¶ 5, 7, and the screenshots of the overtime sign-up sheets on these dates reflect that she held a custodial position, Pl.'s aff.,

AO 72A
(Rev. 8/82)

exs. A-B. However, the sign-up sheets that Defendant has produced list Plaintiff as a noncustodial employee on these dates. Pl.'s Aff., Exs. A-B. In fact, Defendant's records dating back to November 2011 show Plaintiff as having neither held a custodial position nor been at the top of the overtime priority list since that time. Dkt. No. 51, p. 9 (citing Dkt. No. 51, Ex. 5); Dkt. No. 54, p. 14.

As to medical trips, Plaintiff has testified that between February 22, 2012, and September 27, 2013, she went on over thirty medical trips. SUF, ¶ 76. Nevertheless, Plaintiff emphasizes in her affidavit that Defendant's daily rosters for August 2012 show that Officer Ken Lee worked ten medical trips, and Officer Joseph Mosely worked fifteen, while Plaintiff was offered and accepted only two opportunities to take such trips that month. Pl.'s Aff., ¶ 10.

Thomason has testified that the lieutenants assigning overtime shifts during the period in question were skipping over Plaintiff's name on the priority list and not offering her overtime shifts and medical trips that she would otherwise have been granted, because certain officers had informed the lieutenants that they would refuse to work a shift or trip alongside Plaintiff. Thomason Dep., 89:24-90:16. Consequently, Thomason has stated that Plaintiff missed out on the generous

AO 72A
(Rev. 8/82)

overtime pay afforded to staff members who worked these positions. Id. at 90:19-21.

## VII. Disciplinary Actions Against Plaintiff

On April 29, 2012, Plaintiff received a "Form B," which notifies an employee that he or she is the subject of an investigation. Pl.'s Dep., 129:5-22. The Form B stated that an inmate had accused Plaintiff of having sexual intercourse with Pritchard at the prison, and that she would be investigated for "unprofessional conduct of a sexual nature." Id. at 132:19-133:2. Thomason stated at her deposition that FCI Jesup typically does not initiate a Form-B inquiry based on an accusation of a single inmate, and that it was "unusual" that FCI Jesup did so in Plaintiff's case. Thomason Dep., 81:22-82:9.

Over the course of the following months, Plaintiff made several requests for a letter clearing her of this allegation, but she never received any response. Pl.'s Dep., 136:12-16. When Warden Hastings sent Plaintiff a clearance letter in December 2012, id. at 136:16-18, she explained that the inmate's allegation "required a thorough investigation," Pl.'s dep., ex. 13. Even so, Defendant has produced documents showing that the investigation was completed in May 2012; an unspecified deficiency in FCI Jesup's investigative packet delayed its approval until August 2012; and—despite the September 10, 2012,

AO 72A
(Rev. 8/82)

due date for the FCI Jesup investigator to transfer the case to the status of "pending case closure"—the investigator did not do so until February 20, 2013. Dkt. No. 51, Ex. 6.

Plaintiff received another Form B in October 2013—this time informing her of an inmate's allegation that she had danced naked on a table at the prison "to show [the inmates] that [she] was a woman." Pl.'s Dep., 129:25-130:5. Notwithstanding Plaintiff's discovery request for the production of all documents relating to "any allegation of misconduct, investigation of an allegation of misconduct, or disciplinary action," Defendant has not disclosed any report of an investigation into this charge. Dkt. No. 51, p. 12. As of August 7, 2015, when Plaintiff filed her Response to the instant Motion, she had not received a letter clearing her of this allegation and believed that the case remained pending. Id. at p. 11 (citing Pl.'s Dep., 130:1-3). Notably, Warden Hastings has testified that allegations of sexual misconduct are automatically referred for further investigation, and that a written report must be generated for any investigation of a complaint against an employee. Dkt. No. 51, Ex. 9 ("Hastings Dep."), 35:2-24, 53:21-24.

Effective October 20, 2013, Plaintiff voluntarily moved from Correctional Officer to the lower-paying secretary position. SUF, ¶¶ 6, 8. Plaintiff affies that while the

AO 72A
(Rev. 8/82)

disciplinary investigations have remained pending—which has encompassed "most of 2012, the end of 2013, all of 2014, and all of 2015"—she "ha[s] refrained from applying for promotions for which [she was] highly qualified because [she] know[s] that [she] cannot be promoted until [she is] cleared of the misconduct accusations." Pl.'s Aff., ¶ 9. According to Thomason, it is "common knowledge" in the BOP that no warden will refer an employee for a promotion or transfer while the employee is the subject of a pending investigation. Thomason Dep., 83:4-17. Confirming this statement, Warden Hastings acknowledged at her deposition that she, in fact, would not promote an officer with a pending disciplinary case, unless it had been conclusively determined that the officer would be cleared of any alleged misconduct. See Hastings Dep., 106:3-107:6. In early 2015, Plaintiff requested to change back to the correctional officer position, and the FCI Jesup officials informed Plaintiff that "they had no slots" open for this position and that she needed to reapply, "yet they hired [twelve] people." Pl.'s Dep., 42:23-43:5.

## VIII. Inmate Incident Reports

In September 2012, Plaintiff submitted a disciplinary report documenting that she had observed an inmate engaging in sexual activity in his cell, in violation of prison policy. Pl.'s Dep., Ex. 15. Plaintiff has testified that she followed

15

up on the status of this report on three separate occasions—each time learning that the report had been "lost" and having to rewrite it—before any investigation into the incident ever took place. Id. at 140:11-21. While the FCI Jesup Investigator promptly recommended that Plaintiff's report be expunged, the Disciplinary Hearing Officer—who serves at the next level of decision making and reports to a regional director rather than the warden of any particular facility, see Hastings dep., 67:4-68:2—sustained the charge. Pl.'s Dep., Ex. 15, pp. 3-4. The Disciplinary Hearing Officer noted that the FCI Jesup Investigator's recommendation that the charge be expunged was "not based on any specific evidence, or information that would cause th[e] hearing officer to agree." Id. at Ex. 15, p. 4.

According to Plaintiff, she later checked the computer system that tracks inmate incident reports and found that the last nine of her write-ups against inmates had been expunged or lost. Id. at 139:7-9. In one of these instances, in October 2012, Millwood reported that an inmate had sent an e-mail to his mother stating, in part, that the Captain and Lieutenant had helped him "get out of" a prior disciplinary write-up that Plaintiff had filed against him. Id. at 139:19-140:4. Plaintiff has described being "humiliated" when she had to process the inmate's paperwork allowing him to transfer to a halfway house, knowing that she had filed two disciplinary

16

reports against him that were disposed of without investigation. Id. at 147:13-24.

Warden Hastings has since testified that the inmate's e-mail was "absolutely" problematic and "should have been processed." Hastings Dep., 63:21-64:11. While Warden Hastings indicated at her deposition that every institution has issues with captains and lieutenants "sometimes . . . do[ing] away with incident reports without them going through the process," she stated that she had not dealt with this issue at FCI Jesup other than in Plaintiff's case. Id. at 60:14-61:10.

## IX. Plaintiff's Second EEO Filing

On June 4, 2012, Plaintiff again contacted an EEO counselor to begin the process for filing a second EEO complaint. SUF, ¶ 58. Plaintiff reported, in part, that she had been the target of retaliation following her report of sexual harassment to the EEO Counselor on January 31, 2012. Dkt. No. 11, Ex. F, p. 6. In particular, Plaintiff referenced "her leave requests . . . being arbitrarily delayed by management"; FCI Jesup officials selecting noncomplaining officers over her for overtime shifts and medical trips; and officials "subject[ing] [her] to frivolous investigations." Id. Plaintiff filed her administrative complaint on these grounds on July 23, 2012. SUF, ¶¶ 62-63.

AO 72A
(Rev. 8/82)

## X. Plaintiff's Causes of Action

Plaintiff filed suit against Defendant in this Court on March 14, 2014. Dkt. No. 1. Plaintiff seeks to hold Defendant liable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"), for discrimination on the basis of a sexual harassment hostile work environment, id. at ¶¶ 40-48 (count one), and retaliation, id. at ¶¶ 49-60 (count two). Plaintiff requests declaratory and injunctive relief, as well as special and compensatory damages, costs, and attorneys' fees. Id. at ¶ 65.

## LEGAL STANDARDS

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute over such a fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T.

AO 72A
(Rev. 8/82)

<u>Washington Broad. Serv., Inc.</u>, 234 F.3d 501, 507 (11th Cir. 2000).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case. <u>Id.</u> at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. <u>Anderson</u>, 477 U.S. at 257.

The nonmovant may satisfy this burden in two ways: First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting <u>Celotex Corp.</u>, 477 U.S. at 332 (Brennan, J., dissenting)). Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." <u>Id.</u> at 1117. Where the nonmovant attempts to carry this burden instead with nothing more "than a repetition of his conclusional allegations, summary judgment for

19

the defendants [is] not only proper but required." Morris v.
Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981) (citing Fed. R.
Civ. P. 56(e)).

## DISCUSSION

Defendant now moves for summary judgment on both of
Plaintiff's Title VII claims. Dkt. No. 43. Applying the above-
described standards, the Court addresses the parties' arguments
with respect to each claim in turn.

## I. Sexual Harassment Hostile Work Environment Claim (Count I)

Defendant maintains that she is entitled to judgment in her
favor on Plaintiff's claim in count one, because the allegedly
harassing conduct of the FCI Jesup employees either failed to
rise to the level of harassment or was not based on Plaintiff's
gender. Dkt. No. 43, pp. 12-21. Defendant contends that even
if any particular act amounted to harassment based on gender,
the employees' conduct, taken together, was not so severe or
pervasive as to create a hostile work environment for which
Defendant could be held liable. Id. at pp. 21-24. Even if
Plaintiff could make such a showing, Defendant continues, the
affirmative defense set forth in Faragher v. City of Boca Raton,
524 U.S. 775 (1998), and Burlington Industries, Inc. v. Ellerth,
524 U.S. 742 (1998), shields her from any liability for the
same. Id. at pp. 24-25.

20

In her Response, Plaintiff clarifies that her sexual harassment hostile work environment claim is based only on the following allegations:

- Pritchard's comment to a group of employees that his "dick fell in [Plaintiff's] mouth";

- Pritchard's statement that he "didn't know how it happened" because he was intoxicated;

- Lieutenant Arnett's question of "can she swallow?";

- Officer Bowen's assertion that Plaintiff had "road rash" on her mouth from performing oral sex;

- several unidentified officers' miming of oral sex as they passed Plaintiff in the prison hallways;

- unidentified officers' admonitions not to "get caught on the pier" with Plaintiff; and

- Lieutenant Arnett's warning not to "go fishing" with her.

Dkt. No. 51, pp. 18-19.[4] Plaintiff argues that the evidence of these statements creates a genuine dispute of material fact precluding summary judgment on Plaintiff's sexual harassment claim. Id. at pp. 15-30. Plaintiff also submits that this

---

[4] Plaintiff specifically notes that despite Defendant's suggestion, see SUF, ¶ 27, the event involving Pritchard "flaunting" Nurse Townsend in his office—which Plaintiff later reported to prison management—"is not one that Plaintiff alleges was an act of sexual harassment under Title VII." Dkt. No. 51-1, ¶ 27.

AO 72A
(Rev. 8/82)

evidence defeats Defendant's assertion of any affirmative defense at this time.  Id. at p. 23.

Pursuant to Title VII, it is unlawful for an employer to discriminate "with respect to [an employee's] compensation, terms, conditions, or privileges of employment," on the basis of her "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  While Title VII does not explicitly mention sexual harassment, it is well established that sexual harassment can constitute discrimination based on sex under Title VII.  See Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  Even so, sexual harassment amounts to sex discrimination "only when the harassment alters the terms or conditions of employment."  Id. at 1245.

Sexual harassment meets this threshold when "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Hyde v. K.B. Home, Inc., 355 F. App'x 266, 271 (11th Cir. 2009) (quoting Harris, 510 U.S. at 21).  To establish such a "hostile work environment" claim, a plaintiff must demonstrate the following:

> (1) she is a member of a protected group; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) "the harassment

AO 72A
(Rev. 8/82)

was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment;" and (5) there is a basis for employer liability.

Id. at 271-72 (quoting Mendoza, 195 F.3d at 1245).

In the case at bar, the parties do not dispute that Plaintiff, as a female, belongs to a protected class under the first element. See Dkt. No. 43, p. 12; Dkt. No. 51, p. 15. Nor does Defendant challenge the harassing nature of any of the FCI Jesup employees' alleged behaviors under element two, other than the "swallow" comment made by Lieutenant Arnett. See Dkt. No. 43, pp. 12-13.[5] However, Defendant's argument regarding Lieutenant Arnett's comment—that he was on the phone with his wife discussing his sick daughter, not Plaintiff, see id.— squarely contradicts Thomason's sworn statement that an employee, who was present when Lieutenant Arnett made this comment, reported that he did so in the context of a conversation with Pritchard about Plaintiff performing oral sex, Thomason dep., 123:23-25. Defendant thus fails to show the

---

[5] In her Reply brief, Defendant challenges Pritchard's comments as not constituting harassment, and the alleged statements of other employees as unsubstantiated, dkt. no. 54, pp. 5, 10-11; however, Defendant waived these arguments, at this stage, by not raising them in her Motion, Herring v. Sec'y, Dept. of Corrs., 397 F.3d 1338, 1342 (11th Cir. 2005) ("As we repeatedly have admonished, '[a]rguments raised for the first time in a reply brief are not properly before a reviewing court.'" (alteration in original) (quoting United States v. Coy, 19 F.3d 629, 632 n.7 (11th Cir. 1994))).

AO 72A
(Rev. 8/82)

absence of any dispute of material fact as to whether the conduct was harassing under element two.

### A. Harassment Based on Her Sex (Element Three)

For an employer's statements or conduct to create a sexually hostile work environment in violation of Title VII, "a reasonable inference must be drawn that it occurred because of sex." Madrid v. Homeland Sec. Sols. Inc., No. 1:14-CV-29 (WLS), 2015 WL 5769230, at *5 (M.D. Ga. Sept. 30, 2015) (citing Livingston v. Marion Bank & Tr. Co., 30 F. Supp. 3d 1285, 1301 (N.D. Ala. 2014)); see also Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998) ("Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion] . . . because of . . . sex.'" (emphasis omitted) (alterations in original)). In other words, a plaintiff must prove that "but for the fact of her sex, she would not have been the object of harassment." Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir.1982) (citing Bundy v. Jackson, 641 F.2d 934, 942–43 (D.C. Cir. 1981), and Tomkins v. Pub. Serv. Elec. & Gas Co., 568 F.2d 1044, 1047 n.4 (3d Cir. 1977)).

In Succar v. Dade County School Board—on which Defendant relies, see dkt. no. 43, pp. 14-15—the plaintiff, a teacher, sued the school board under Title VII, alleging a sexual harassment hostile work environment based on the conduct of a

24

fellow teacher with whom the plaintiff had previously had a consensual sexual relationship. 229 F.3d 1343, 1344 (11th Cir. 2000). Specifically, the fellow teacher had "verbally and physically harassed [the plaintiff] and sought to embarrass him in front of colleagues and students" after the termination of their relationship. Id. The Court of Appeals for the Eleventh Circuit affirmed the district court's grant of summary judgment in favor of the school board, holding that, under the circumstances of that case, "harassment inflicted upon an employee by a co-worker with whom that employee had a consensual sexual relationship [was not] actionable under Title VII . . . under a 'hostile work environment' theory of recovery." Id. The Court reasoned that the fellow teacher's harassment of the plaintiff "was motivated not by his male gender, but rather by [the plaintiff's] contempt for [him] following their failed relationship." Id. at 1345.

While this case, like Succar, involves a hostile work environment claim that is based, in part, on the harassing behavior of a coworker with whom Plaintiff had engaged in a prior consensual sexual relationship, SUF, ¶ 14, the similarities between this case and Succar begin and end there. Unlike the harassing commentary in Succar, Pritchard's offensive comments were sexual in nature, including that "his dick had fell [sic] in her mouth" and that "he didn't know how it [had]

25

happened," Thomason dep., 116:3-6.  See Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1188-89 (11th Cir. 2001) (finding that the plaintiff's ex-lover and coworker had engaged in "inappropriate behavior [that] crosse[d] the line into Title VII harassment" based on its "sexual . . . nature"); see also Baker v. Int'l Longshoremen's Ass'n, No. CIVA CV205-162, 2009 WL 368650, at *3 (S.D. Ga. Feb. 13, 2009) ("[A coworker] does not get a 'free pass' for such conduct simply because he once had a romantic relationship with [the plaintiff]." (citing Lipphardt, 267 F.3d at 1188-89)).

Further distinguishing this case from Succar is that, here, other employees and prison inmates—none of whom is alleged to have carried on a previous sexual relationship with Plaintiff—joined in on the sexually harassing conduct.  The record here reflects that after learning of Plaintiff's sexual activities with Pritchard, prison officials gestured the act of performing oral sex when passing by her in the hallway, Pl.'s dep., 158:24, and made comments that were relayed to her, such as Lieutenant Arnett's alleged question, "[D]id she swallow?" and admonition, "Don't go fishing with [Plaintiff]," Thomason dep., 123:23-25; Officer Bowen's statement regarding "road rash" on her mouth from performing oral sex, Pl.'s dep., 100:21-101:6; and other employees' warnings "not to get caught on the pier" with Plaintiff, id. at 154:12-18.  Notably, nothing suggests that

AO 72A
(Rev. 8/82)

these employees made similar comments or gestures toward Pritchard, despite the fact that he, too, had purportedly taken part in the sexual activities.

This case thus does not come within the ambit of Succar. Plaintiff offers evidence that Pritchard and other employees made harassing comments and gestures that were overtly or implicitly sexual in nature, and these behaviors could be construed by a trier of fact as harassing conduct based on Plaintiff's sex. Accordingly, Plaintiff makes a sufficient showing under the third element.

### B. Severe or Pervasive Harassment (Element Four)

The fourth requirement—that the harassment be severe or pervasive—contains an objective and a subjective component. Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1276 (11th Cir. 2002). To be actionable, the "behavior must result in both an environment 'that a reasonable person would find hostile or abusive' and an environment that the victim 'subjectively perceive[s] . . . to be abusive.'" Id. (alterations in original) (quoting Harris, 510 U.S. at 21-22).

Here, Plaintiff subjectively perceived her working environment to be hostile. Plaintiff was distraught over her coworkers' actions, suffered from high blood pressure, checked into a hospital for care, and avoided work for nearly one month. Pl.'s Dep., 101:7-17. Defendant does not dispute these facts.

AO 72A
(Rev. 8/82)

See Dkt. No. 43, pp. 21-22. Rather, at issue is whether Plaintiff's claim meets the requirement of an objectively hostile or abusive work environment.

In determining whether a work environment was objectively hostile, the Eleventh Circuit has found the following factors to be relevant: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Mendoza, 195 F.3d at 1246. A court must evaluate the complained-of conduct "in context, not as isolated acts, and . . . under the totality of the circumstances." Id. (citing Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997)); see also Oncale, 523 U.S. at 81-82 ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.").

In this case, the first factor—the frequency of her coworkers' conduct—weighs in Plaintiff's favor. In analyzing the frequency of the conduct, there is no "magic number" of insults that precludes summary judgment. Miller, 277 F.3d at 1276 (quoting Shanoff v. Ill. Dep't of Human Servs., 258 F.3d 696, 704 (7th Cir. 2001)). "[R]epeated incidents of verbal

28

harassment that continue despite the employee's objections . . .
are indicative of a hostile work environment." Id. (quoting
Shanoff, 258 F.3d at 704). Plaintiff identifies three specific
instances in which FCI Jesup employees made offensive comments
about her, including when Lieutenant Arnett allegedly asked the
"swallow" question, when he made the "[d]on't go fishing" joke,
Thomason dep., 123:23-25, and when Officer Bowen made the "road
rash" statement, Pl.'s dep., 100:21-101:6. Plaintiff also puts
forth evidence that other employees made similar comments, such
as warnings "not to get caught on the pier" with Plaintiff, and
gestured the act of performing oral sex when passing by her,
"every single day" over the course of many months, Pl.'s dep.,
154:12-18, 158:10-159:10. See Miller, 277 F.3d at 1276 n.6 ("In
Johnson, we concluded that 'roughly fifteen separate instances
of harassment over the course of four months' was sufficiently
frequent." (quoting Johnson v. Booker T. Wash. Broad. Serv.,
Inc., 234 F.3d 501, 509 (11th Cir. 2000))); cf. Cargo v. Ala.,
Bd. of Pardons & Parole Div., 391 F. App'x 753, 755 (11th Cir.
2010) ("Five or six incidents over the course of three to four
years is hardly frequent conduct.").

Additionally, Plaintiff offers evidence upon which a
reasonable jury could conclude that the behavior of the FCI
Jesup officials was severe and humiliating under the second and
third factors. See Mendoza, 195 F.3d at 1246. Conduct is

29

severe when the work environment "is 'permeated with discriminatory intimidation, ridicule and insult,' not where there is the 'mere utterance of an . . . epithet.'" Miller, 277 F.3d at 1276-77 (quoting Harris, 510 U.S. at 21). "'[S]imple teasing,' . . . offhand comments, and isolated incidents (unless extremely serious) [do] not amount to discriminatory changes in the 'terms and conditions of employment.'" Faragher, 524 U.S. at 788 (citation omitted) (quoting Oncale, 523 U.S. at 82). As to whether behavior is physically threatening or humiliating, as opposed to a mere offensive utterance, the Eleventh Circuit has determined that "the context of the[] statements is critical." Fortson v. Carlson, 618 F. App'x 601, 608 (11th Cir. 2015) (citing Oncale, 523 U.S. at 77, 81-82 ("[I]n . . . all[] harassment cases, [the relevant] inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target.")).

In this case, the evidence suggests that the prison officials' comments and gestures about Plaintiff's sexual activities surpassed the threshold of tolerable teasing and insults. Far from "mere utterances" or "isolated incidents," the prison employees engaged in these behaviors "every single day" for a period of many months. Pl.'s Dep., 154:12-18, 158:10-159:10. This conduct so permeated Plaintiff's workplace that even the prison inmates eventually caught on and joined in

AO 72A
(Rev. 8/82)

on the banter. See id. at 147:19-23. While nothing indicates that these behaviors were physically threatening, the revelation of Plaintiff's private sexual activity—to the extent that it became common knowledge among employees and inmates alike—could have caused a reasonable person in her shoes to be so humiliated as to render her work environment hostile or abusive.

The fourth factor in this analysis—which considers whether the conduct unreasonably interfered with job performance—also swings in Plaintiff's favor at this stage. See Mendoza, 195 F.3d at 1246. The record reflects that Plaintiff, upon hearing of the derogatory remarks of her coworkers in early December 2011, became sick, visited the hospital for high blood pressure, and worked only periodically for the rest of that month. Pl.'s Dep., 101:14-17. The evidence also shows that Plaintiff spent a number of days at an inpatient psychiatric facility in February 2012. Dkt. No. 51, p. 14. Furthermore, Plaintiff has testified that inmates began teasing her about her alleged sexual encounters, Pl.'s dep., 147:19-23—a fact that, if true, could have undermined her authority and her ability to fulfill her duties as a correctional officer. Thus, on balance, these factors suggest that a reasonable jury could find objectively severe or pervasive harassment on the part of the FCI Jesup officials.

## C. Vicarious Liability (Element Five)

Where an employee's supervisor behaves in a sexually harassing manner, and such harassment does not result in a tangible employment action, the employer-defendant will be vicariously liable for his conduct except in certain circumstances. <u>Vance v. Ball St. Univ.</u>, 133 S. Ct. 2434, 2442 (2013). Those circumstances—which provide an affirmative defense to vicarious liability—include where the employer shows both that (1) "it exercised reasonable care to prevent and promptly correct any harassing behavior" and (2) "the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that were provided." <u>Id.</u> (citing <u>Faragher</u>, 524 U.S. at 807, and <u>Ellerth</u>, 524 U.S. at 765). Where it is an employee's coworker, rather than her supervisor, who perpetrates the sexual harassment, the employer-defendant may be liable "only if it was negligent in controlling working conditions." <u>Id.</u> at 2439; <u>see also</u> <u>Ellerth</u>, 524 U.S. at 759 ("An employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it.").

The evidence in this case presents a jury question as to whether Defendant may be liable for any sexually harassing conduct on the part of Pritchard and Lieutenant Arnett as supervisors. The record reflects that Plaintiff reported her

32

affair with Pritchard on November 16, 2011, and that Captain
Carrino immediately ordered Pritchard "to avoid interaction and
contact with [Plaintiff]." SUF, ¶¶ 20, 28, 32. Nevertheless,
the evidence shows that when Pritchard made harassing comments
on November 17, 2011, Thomason dep., 114:22-116:6, he still held
the position of Lieutenant, SUF, ¶¶ 13-14—and that Lieutenant
Arnett similarly made offensive remarks while serving in this
capacity, Thomason dep., 123:23-25. Pritchard has testified
that lieutenants are superior to correctional officers,
Pritchard dep., 20:9-13, and the record shows that lieutenants
hold various responsibilities including generating work
schedules and assigning overtime shifts for FCI Jesup employees,
Thomason dep., 88:18-89:4, 93:14-15. See Vance, 133 S. Ct. at
2443 (supervisors have the power to effect "significant change
in employment status, such as hiring, firing, failing to
promote, reassignment with significantly different
responsibilities, or a decision causing a significant change in
benefits" (quoting Ellerth, 524 U.S. at 761)).

Additionally, Plaintiff shows that there is a genuine issue
of material fact with respect to when Defendant had notice of
the allegedly harassing conduct, as it relates to the
reasonableness of Defendant's actions in promptly correcting or
responding to the same. Specifically, the evidence shows that
Pritchard made his harassing comments at a meeting attended by

33

several lieutenants and officers in November 2011, and that

Lieutenant Arnett made his "swallow" comment at a "lieutenants

meeting" held shortly thereafter, Thomason dep., 114:22-116:6,

123:12-25. See Miller v. Kenworth of Dothan, Inc., 277 F.3d

1269, 1278 (11th Cir. 2002) (one factor indicative of an

employer's constructive knowledge is "the remoteness of the

location of the harassment as compared to the location of

management" (quoting Allen v. Tyson Foods, Inc., 121 F.3d 642,

647 (11th Cir. 1997))). The evidence also reflects that within

days of Pritchard's statements at the November 2011 meeting,

multiple officers were reporting to Thomason that they had heard

other employees making derogatory comments and jokes about

Plaintiff, id. at 7:7-10, 120:23-130:21, and these comments

continued "every single day" during the following months, Pl.'s

dep., 154:12-18, 158:10-159:10. See id. at 1278-79 (other

factors bearing on constructive knowledge include "whether the

harassment occurs intermittently over a long period of time" and

"whether there were only a few, discrete instances of

harassment" (quoting Allen, 121 F.3d at 647)). Nevertheless, it

appears that it was not until after Thomason formally reported

this conduct to Warden Haynes on February 15, 2012, that the FCI

Jesup officials initiated an OIA investigation into the matter.

SUF, ¶¶ 36-37. On these facts, a jury could reasonably conclude

that Defendant had constructive knowledge of the harassing

34

conduct in November 2011 and failed to take immediate and appropriate corrective action. As this inquiry is relevant to Defendant's liability for the actions of both Plaintiff's supervisors and coworkers, the existence of a genuine factual dispute in this regard is sufficient for Plaintiff's claim to survive summary judgment under the fifth and final element.

In sum, Plaintiff puts forth sufficient evidence to create a jury question on all five elements of her sexual harassment hostile work environment claim. Defendants thus are not entitled to summary judgment on this claim, and their Motion to this effect is **DENIED**.

## II. Retaliation Claim (Count II)

Defendant also moves to dismiss Plaintiff's retaliation claim, arguing, at the outset, that the Court should not attempt to conflate Plaintiff's reporting of the affair to the Warden in November 2011 with engaging in protected EEO activity. Dkt. No. 43, p. 25. Rather, Defendant maintains that Plaintiff did not engage in any protected activity until her first EEO contact in January 2012. Id. at p. 26. However, Defendant contends that Plaintiff cannot sustain a claim for retaliation based on the prison officials' acts after that time—specifically, their scrutinizing of her leave request—because Plaintiff has failed to exhaust her administrative remedies with regard to this allegation. Id. at pp. 32-35. In any event, Defendant asserts

AO 72A
(Rev. 8/82)

that Plaintiff fails to carry her burden of showing that any of the officials' actions after January 2012 amounted to a tangible adverse employment decision that was merely pretextual. Id. at pp. 26-32.

In response to Defendant's Motion, Plaintiff concedes that her protected EEO activity commenced on January 31, 2012, rather than in November 2011. Dkt. No. 51, p. 30. Plaintiff also clarifies that her retaliation claim is based only on the FCI Jesup employees allegedly having done the following after learning of Plaintiff's EEO activity: (1) scrutinizing her leave request, (2) skipping over her in assigning overtime shifts and medical trips, (3) allowing frivolous disciplinary actions against her to remain pending, and (4) ignoring or expunging her inmate incident reports. Id. at pp. 31-35. As to the scrutinizing of her leave request, Plaintiff counters Defendant's exhaustion argument by stating that she was not required to file separate EEO charges for each retaliatory event. Id. at p. 31. Plaintiff also submits that genuine issues of material fact regarding each of these events preclude summary judgment on her retaliation claim. Id. at pp. 30-35.

## A. Exhaustion of Administrative Remedies

An action for discrimination in violation of Title VII may not be brought "unless the alleged discrimination has been made the subject of a timely-filed EEO[] charge." A.M. Alexander v.

Fulton Cty., 207 F.3d 1303, 1332 (11th Cir. 2000) (citing 42 U.S.C. § 2000e-5), overruled on other grounds by Manders v. Lee, 338 F.3d 1304, 1328 n.52 (11th Cir.2003). According to EEO regulations, a charge must set forth, among other things, "[a] clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices." Id. (alteration in original) (quoting 29 C.F.R. § 1601.12(a)(3)). A subsequent judicial complaint is "limited by the scope of the EEO[] investigation which can reasonably be expected to grow out of the charge of discrimination." Id. (quoting Mulhall v. Advance Sec., Inc., 19 F.3d 586, 589 n.8 (11th Cir. 1994)).

Nevertheless, "it is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge." Thomas v. Miami Dade Pub. Health Tr., 369 F. App'x 19, 23 (11th Cir. 2010) (quoting Gupta v. E. Tex. St. Univ., 654 F.2d 411, 414 (5th Cir. 1981); then citing Baker v. Buckeye Cellulose Corp., 856 F.2d 167, 168-69 (11th Cir. 1988)). Rather, "the district court has ancillary jurisdiction to hear such a claim when it grows out of an administrative charge that is properly before the court." Id. (quoting Gupta, 654 F.2d at 414; then citing Baker, 856 F.2d at 168-69).

AO 72A
(Rev. 8/82)

Despite Defendant's suggestion to the contrary, see dkt. no. 43, pp. 32-35, Plaintiff's second EEO complaint, filed on July 23, 2012, explicitly cited "her leave requests . . . being arbitrarily delayed by management" as retaliatory conduct. Dkt. No. 11, Ex. F, p. 3. Indeed, of the grounds on which Plaintiff now relies to support her retaliation claim, it is the FCI Jesup officials' disregarding of her inmate incident reports that was not mentioned in the second EEO filing. See id. Although Defendant does not challenge this allegation on exhaustion grounds, see dkt. no. 43, pp. 32-35, the Court notes that any attempt to do so would be futile.

Plaintiff claims that the prison officials' actions in ignoring and expunging her inmate incident reports constituted unlawful retaliation on account of her pursuing an EEO sexual harassment charge. See Dkt. No. 51, p. 2. It is undisputed that Plaintiff contacted an EEO Counselor to initiate the process of filing a sexual harassment complaint on January 31, 2012, and that Plaintiff finalized the EEO complaint on March 14, 2012. Dkt. No. 11, Ex. C. The record also shows that it was not until around September 2012—after Plaintiff had taken steps to pursue the sexual harassment charge—that she noticed that her previous nine incident reports had been disregarded without investigation. Pl.'s Dep., 139:7-9. Because Plaintiff contends that this allegedly retaliatory act grew out of her

AO 72A
(Rev. 8/82)

earlier initiation of an EEO harassment charge, Plaintiff need not have exhausted her administrative remedies prior to claiming retaliation on this basis.  Thus, Defendant fails to show that she is entitled to summary judgment based on a failure to exhaust.

### B. Prima Facie Case of Retaliation

Title VII makes it unlawful for an employer to retaliate against an employee "because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [42 U.S.C. § 2000e-3(a)]."  Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 956 (11th Cir. 1997) (quoting 42 U.S.C. § 2000e-3(a)).  To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in statutorily protected activity, (2) she suffered a materially adverse action, and (3) there was a causal link between these two events.  Butler v. Ala. Dep't of Transp., 536 F.3d 1209, 1212-13 (11th Cir. 2008).  Once a plaintiff makes this showing, the burden shifts to the defendant-employer "to articulate a legitimate, nondiscriminatory reason" for the adverse employment action.  Brown v. Ala. Dep't of Transp., 597 F.3d 1160, 1174 (11th Cir. 2010) (citing Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002)).  If the defendant is able to do so, then the

AO 72A
(Rev. 8/82)

burden shifts back to the plaintiff to offer evidence that the defendant's proffered reason "is a pretext for illegal discrimination." Id. (quoting Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004)).

### 1. Statutorily Protected Activity (Element One)

"Statutorily protected expression includes internal complaints of sexual harassment to superiors as well as complaints lodged with the EEOC." Pipkins v. City of Temple Terrace, Fla., 267 F.3d 1197, 1201 (11th Cir. 2001) (citing Rollins v. Fla. Dep't of Law Enforcement, 868 F.2d 397, 400 (11th Cir. 1989)). As to EEO complaints, protected activity includes not only filing the charge but also assisting or participating in an investigation or other related proceeding. Green v. Adm'rs of Tulane Educ. Fund, 284 F.3d 642, 657 (5th Cir. 2002) (citing 42 U.S.C. § 2000e-3(a)). Accordingly, a plaintiff may establish retaliation under Title VII "if she c[an] prove the requisite causal nexus between [any] of these activities and an adverse employment decision." Pipkins, 267 F.3d at 1201 (citing Rollins, 868 F.2d at 400).

Here, the parties agree that Plaintiff first engaged in statutorily protected activity in contacting the EEO Counselor regarding the alleged sexual harassment on January 31, 2012. See Dkt. No. 43, p. 25; Dkt. No. 51, p. 30. Plaintiff also notes that the following activities fall within the scope of

40

protected expression: her filing of the sexual harassment EEO charge on March 14, 2012; her contacting the EEO Counselor again on June 4, 2012; her filing a second charge for sexual harassment and retaliation in July 2012; her participation in the EEO process as to these charges; and her filing of this lawsuit. See Dkt. No. 51, p. 30. There is thus ample support for finding that Plaintiff's retaliation claim satisfies this element.

### 2. Materially Adverse Action (Element Two)

To prove a "materially adverse action," a plaintiff must demonstrate that the employer took an action that "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (2006)). Whether an employment action is materially adverse is "a question of fact, although one still subject to the traditional rules governing summary judgment." Hyde, 355 F. App'x at 268 (citing Hinson v. Clinch Cty., Ga. Bd. of Educ., 231 F.3d 821, 830 (11th Cir. 2000)). A court entertaining this inquiry on summary judgment must view the employment action from "the perspective of a reasonable person in the plaintiff's position," considering the totality of the circumstances. Burlington N. & Santa Fe Ry. Co., 548 U.S. at 69-70. In doing so, an employer's "petty slights, minor

41

annoyances, and simple lack of good manners [do] not create such deterrence" to Title VII's remedial mechanisms as to constitute a materially adverse action. Id. at 68 (citing 2 EEOC 1998 Manual § 8, 8-13).

Plaintiff sustains her burden of proving a materially adverse action at this stage. Plaintiff puts forth evidence that the FCI Jesup lieutenants skipped over her in assigning overtime shifts and medical trips, see Thomason dep., 89:24-90:16; Pl.'s aff., ¶¶ 3-8, 10 & exs. A-B, and that doing so denied Plaintiff overtime pay that she had expected to receive, Thomason dep., 90:19-21. See Doe v. Dekalb Cty. Sch. Dist., 145 F.3d 1441, 1449-50 (11th Cir. 1998) (employment action is adverse if it entails a loss of pay or duties (citing Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 886 (6th Cir. 1996))). Additionally, Plaintiff points to evidence that the FCI Jesup officials have allowed disciplinary charges against her to remain pending for all but six months out of the past three years, Pl.'s aff., ¶ 9, rendering her ineligible for a promotion or transfer during this time, Thomason dep., 83:4-17; Hastings dep., 106:3-107:6; Pl.'s dep., 42:23-43:5; Pl.'s aff., ¶ 9. See Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008) (materially adverse action includes an employment decision that, in some substantial way, deprives an employee of employment opportunities).

AO 72A
(Rev. 8/82)

Further, Plaintiff submits testimonial evidence suggesting that the FCI Jesup officials expunged or lost her inmate incident reports without investigation on nine separate occasions, Pl.'s dep., 139:7-9—including one report that was "absolutely" troublesome and "should have been processed" for investigation, Hastings dep., 63:21-64:11, and another that was recommended for expungement without "any specific evidence" to support this decision, Pl.'s dep., ex. 15, p. 4. See EEOC Compliance Manual § 8-II.D.1 (1998) ("Suspending or limiting access to an internal grievance procedure also constitutes an 'adverse action.'"); see, e.g., Johnson v. Palma, 931 F.2d 203, 207 (2d Cir. 1991) (materially adverse action included refusing to proceed with the employee's grievance until he withdrew his discrimination complaint).

### 3. Causal Connection (Element Three)

To establish a causal connection between participation in a protected activity and an adverse employment action, "a plaintiff need only show that the protected activity and the adverse action were not wholly unrelated." Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000) (internal quotation marks omitted) (quoting Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1354 (11th Cir. 1999)). To make this showing, a plaintiff must generally establish "that the decision maker was aware of the protected conduct at the time of

the adverse employment action." Id. (citing Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993), and Raney v. Vinson Guard Serv., Inc., 120 F.3d 1192, 1197 (11th Cir. 1997)).

Close temporal proximity between protected conduct and an adverse employment action is generally "sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1298 (11th Cir. 2006) (quoting Brungart, 231 F.3d at 799). If the adverse employment action is taken without knowledge of the protected activity, however, there can be no retaliation. Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 583 (11th Cir. 2000); see also Goldsmith, 996 F.2d at 1163 ("At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action.")

Plaintiff offers sufficient circumstantial evidence that the FCI Jesup officials were aware of her EEO activity to satisfy the causal link requirement of her prima facie case. Plaintiff shows that she contacted the EEO Counselor on January 31, 2012, and finalized her EEO complaint on March 14, 2012. Dkt. No. 11, Ex. C. The record reflects that Plaintiff began to notice that she was being passed over for overtime shifts and medical trips on March 14, 2012, SUF, ¶ 59; Thomason dep., 89:24-90:16; that she received a Form B notifying her of a

disciplinary action against her on April 29, 2012, and again in October 2013, Pl.'s dep., 129:5-130:5; and that she discovered sometime around September 2012 that her nine previously filed inmate incident reports had been expunged or lost, id. at 139:7-9. Construing all reasonable inferences in Plaintiff's favor, as the Court must do at this stage, this evidence suggests that the FCI Jesup officials first engaged in each of these practices within the one- or two-month period after Plaintiff's EEO filing and continued to do so in the following months and, in some cases, years. Cf. Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir. 2006) ("[I]n the absence of any other evidence of causation, a three and one-half month proximity between a protected activity and an adverse employment action is insufficient to create a jury issue on causation." (citing Wascura v. City of South Miami, 257 F.3d 1238, 1248 (11th Cir. 2001))).[6]

As Defendant's Motion is premised upon Plaintiff's asserted inability to establish the causation element of her prima facie

---

[6] To the extent that Plaintiff cites discrepancies between her "custodial" and "noncustodial" status reflected on her overtime sign-up screenshots and Defendant's records, respectively, dkt. no. 51, p. 9, this evidence fails to meet the causation requirement. Plaintiff acknowledges that Defendant's records first classified Plaintiff as "noncustodial" in November 2011, id., such that any action taken by the FCI Jesup officials to this end would have preceded Plaintiff's EEO activity in January 2012, see dkt. no. 11, ex. C. As such, Plaintiff cannot rely on her misclassification to support her claim that the officials manipulated the overtime system in this way in retaliation against her.

45

case, and thus does not attempt to justify the adverse actions, see dkt. no. 43, pp. 25-32, Defendant has waived any arguments, as they relate to this Motion, regarding the legitimate reasons for these actions. See Herring, 397 F.3d at 1342 (quoting Coy, 19 F.3d at 632 n.7)). However, even if the Court were to consider Defendant's arguments insofar as they are set forth in her Reply brief, see dkt. no. 54, pp. 14-16, the proffered reasons would be overcome, at this stage, by Plaintiff's evidence of pretext. See Hurlbert, 439 F.3d at 1298 ("To show pretext, a plaintiff must 'come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" (quoting Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000))).

Defendant cites Plaintiff's misclassification as a noncustodial employee in November 2011—implying that it was this preexisting error in the FCI Jesup records, rather than the later decision making of the lieutenants, that resulted in her missed overtime opportunities. See Dkt. No. 54, pp. 14-15. However, Plaintiff submits screenshots of overtime sign-up sheets reflecting that she was listed as a custodial employee on two dates on which Defendant's records show Plaintiff as a noncustodial employee, see Pl.'s aff., exs. A-B, and these

discrepancies undermine Defendant's showing of a legitimate, nonretaliatory reason on this basis. Even if these records were consistent, Plaintiff's evidence that she began missing overtime shifts around March 2012, SUF, ¶ 59, and that the lieutenants purposely skipped over her at the request of other officers, Thomason dep., 89:24-90:16, suggests that Defendant's asserted justification is implausible and is merely pretext. See Sparks v. Pilot Freight Carriers, Inc., 830 F.2d 1554, 1564 (11th Cir. 1987) ("The implausibility of the alleged justification is sufficient to create a genuine issue of material fact as to whether [the employer's] articulated reason is pretextual." (citing Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 900 (3d Cir. 1987))).

As to the pending disciplinary charges, Defendant points to Warden Hasting's testimony that there were organizational and staffing issues at FCI Jesup that caused delays in investigations during the time period in question. Dkt. No. 54, p. 15. Plaintiff puts forth the following evidence suggesting that this justification is pretext: (1) that it was "unusual" that the FCI Jesup officials initiated investigations in these instances, Thomason dep., 81:22-82:9; (2) that the officials ignored her several requests for clearance letters, Pl.'s dep., 130:1-3, 136:12-16; (3) that the officials delayed in transferring the first case to closed status following the

47

completion of the investigation, dkt. no. 51, ex. 6; and (4) that the officials have failed to disclose any records of the investigation into the second charge, id. at p. 12, despite policies requiring that this type of charge be automatically referred for investigation and be documented in a report, Hastings dep., 35:2-24, 53:21-24. See Hurlbert, 439 F.3d at 1299 ("[A]n employer's deviation from its own standard procedures may serve as evidence of pretext." (citing Bass v. Bd. of Cty. Comm'rs, Orange Cty., 256 F.3d 1095, 1108 (11th Cir. 2001))).

Defendant does not attempt to offer a legitimate reason for the FCI Jesup officials having expunged or lost several of Plaintiff's inmate incident reports following her EEO activity. See Dkt. No. 54, pp. 14-16. Thus, the record before the Court at this stage indicates that there is at least a genuine issue of material fact as to whether the FCI Jesup officials engaged in retaliatory conduct in denying Plaintiff overtime shifts, permitting disciplinary charges to remain unresolved, and disregarding her inmate incident reports. Under these circumstances, summary judgment is inappropriate. Defendant's Motion is, therefore, **DENIED** as it relates to Plaintiff's retaliation claim.

AO 72A
(Rev. 8/82)

## CONCLUSION

For the reasons set forth herein, Defendant's Motion for Summary Judgment (dkt. no. 43) is **DENIED** in its entirety. All claims remain pending at this time.

**SO ORDERED**, this 22ND day of March, 2016.


_____
LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)